**EASTERN PETROLEUM COMPANY, a corporation, et al., Plaintiffs-Appellees,**

v.

**KERR–McGEE CORPORATION, a corporation, Defendant-Appellant.**

**No. 18610.**

United States Court of Appeals, Seventh Circuit.

Aug. 26, 1971.

Pell, Circuit Judge, dissented in part and filed opinion.

Charles A. Bane, Chicago, Ill., Michael Silva, Willard Scott, Oklahoma City, Okl., Isham, Lincoln & Beale, Chicago, Ill., Coleman Hayes, Oklahoma City, Okl., Laurence Lasky, Don S. Hilliker, Robert H. Wheeler, Chicago, Ill., for defendant-appellant.

William R. Dickinson, Jr., Chicago, Ill., J. Fred Schlafly, Alton, Ill., Wilson & McIlvaine, Chicago, Ill., Schlafly, Godfrey & Fitzgerald, Alton, Ill., Donald W. Fyr, Richard C. Fiddes, Chicago, Ill., for plaintiffs-appellees.

Before HASTINGS, Senior Circuit Judge, and PELL and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Interesting legal questions relating to the fugacious character of helium-bearing gas are raised by this appeal, but, as we appraise the issues, need not be answered to determine the dispute between the parties. Their contracts provided that the price to be paid by Kerr-McGee to plaintiffs for gas "shall never be less

than the price paid by Buyer to other sellers of helium-bearing gas from leases or lands in the same general area."

Kerr-McGee did acquire helium-bearing gas from other lands in the same general area, principally from the State of Arizona. The ultimate question presented is whether an increase in the amount of royalty paid by Kerr-McGee to Arizona on account of gas taken from State owned lands was a price increase within the meaning of the contracts between the parties to this litigation. The district court found, we think correctly, that it was.

## I.

The documents in the record use a variety of terms to identify three different economic functions. In an attempt to avoid confusion, in this opinion we shall use the terms "lessor," "operator," and "refiner" to describe these interests.

In 1910 when Arizona became a state it acquired ownership of a vast area of undeveloped land. At various times thereafter it entered into oil and gas leases which, in substance, granted to an operator the right to explore, drill for, produce, and market any oil or gas located under specifically described surface in exchange for the operator's undertaking to pay the State ⅛th of the market value of such oil or gas.

With respect to about 90% of the helium-bearing gas produced in Arizona, Kerr-McGee was the operator and with respect to most of the gas the State was the lessor.[1]

With respect to approximately 10% of the gas, the plaintiffs were operators (the identity of their lessors is not entirely clear). They produced gas and had the right to market it.

When helium-bearing gas was first discovered in Arizona, the only refinery in the United States was operated by the Bureau of Mines of the Department of the Interior in Shiprock, New Mexico, some 125 miles from the Arizona fields. In order to dispose of their gas, Arizona operators thus could either build a pipeline to carry the gas to the government refinery or arrange for the construction of a refinery in Arizona. Kerr-McGee decided to build a plant at Navajo, Arizona, to refine the gas from its own production.

After making that decision, Kerr-McGee negotiated and entered into agreements with plaintiffs providing for the purchase of their helium-bearing gas. Thus, in its capacity as a refiner, Kerr-McGee purchased gas from plaintiffs as operators. The earliest agreement in the record is dated January 31, 1962, and contains the clause quoted above entitling plaintiffs to a price which shall never be less than that paid "to other sellers."

Although the calculation of price varies with both the percentage of helium in the raw gas and the market value of refined helium, all interested parties agreed to use a common denominator for reference in their price negotiations. The relevant price which Kerr-McGee agreed to pay in January, 1962, was 56.7 cents per thousand cubic feet (Mcf).[2]

After reaching this agreement with plaintiffs, Kerr-McGee negotiated the amounts payable to the State of Arizona pursuant to leases which provided for the payment by the operator to the lessor "as royalty the market value at the well as of the time of sale or removal from said lands of Twelve and One-Half per cent (12½%) of the gas so sold, removed or used; * * *." Presumably,

1. At trial, counsel for appellant advised the court that most of the gas-producing land was State owned. Appellee concurred in this statement. Appellant has not contested the trial judge's finding that Kerr-McGee was responsible for approximately 90% and plaintiffs approximately 10% of the total production in Arizona.

2. That price actually applied to gas containing 8% helium by content computed on the basis of a pressure of 15,025 psia and temperature of 60° F., when the market price of refined helium was between $35.00 and $35.99 per Mscf.

no negotiations would have been necessary if the operator had sold the gas to a third party because then both the lessor and the operator would have had the same interest in maximizing the price. Since Kerr-McGee was the refiner as well as the operator, however, it negotiated the "market value" with the State of Arizona. These parties agreed upon a value of 64 cents per Mcf.

Their agreement was reflected in Division Orders which explained exactly how this 64 cents was to be divided among the persons having an interest in the underlying lease. In each such Division Order the State had a ⅛th interest and the operator had almost, but not quite, all of the remainder.[3] The Division Orders were drafted by Kerr-McGee and furnished to the State for execution; they contained a warranty of title to the gas produced from the described lands and authorization to Kerr-McGee "to receive the helium-bearing gas therefrom, purchase it and pay for it, * * *."

After execution of these Division Orders reflecting a market value of 64 cents, Kerr-McGee amended its agreements with the plaintiffs to increase the price of gas purchased from them to 64 cents per Mcf. Each of the plaintiffs renewed its agreement with Kerr-McGee annually thereafter until 1965, when long-term contracts were executed. There was no change in any of the relevant provisions prior to the commencement of this litigation.

For a time, the State of Arizona accepted royalty payments based on the 64

cent market value agreed upon in 1962. However, after a brief period, it revoked the Division Orders; Kerr-McGee then commenced litigation against the State in an Arizona court. Only fragments from the record of that proceeding are before us. It does appear, however, that on December 8, 1966, a judge of the Superior Court of Maricopa County entered an order requiring Kerr-McGee to account to the State on the basis of a market value of $1.76 per Mcf. After Kerr-McGee began making payments on that basis, plaintiffs requested a price increase from 64 cents to $1.76; the increase was refused.

Plaintiffs, all residents of Illinois, brought suit in a state court; defendant, a Delaware corporation, removed the case to the federal court. After trial without a jury, the district court entered judgments aggregating $836,-343.21, plus interest from December 8, 1966, the date of entry of the original order of the Superior Court of Maricopa County, Arizona. Defendant's appeal challenges the merits and the allowance of interest.

## II.

Kerr-McGee contends that its payment of royalties to Arizona was not a "price" paid to another "seller" within the meaning of its contracts with plaintiffs;[4] alternatively, that if Arizona did sell gas, the $1.76 amount was paid for 100%, not just ⅛th, of the production from state-owned lands and,

---

3. Presumably the original operator's interest of ⅞ths was reduced by assignments, ultimately to Kerr-McGee, with the assignor of the working interest retaining a so-called overriding royalty interest. Our identification of merely the "lessor" and "operator" is thus oversimplified by the omission of persons who could be termed "sub-lessors" as well as, in certain cases, persons with whom a minor part of Kerr-McGee's operating interest was shared. Thus, a reference to Kerr-McGee as an operator with a ⅞th interest is a slight overstatement which does not affect our analysis.

4. The pertinent clause in the Eastern Petroleum Company contract reads as follows:

"Notwithstanding the foregoing, the amount to be paid for gas delivered hereunder shall never be less than the price paid by Buyer to other sellers of helium-bearing gas from leases or lands in the same general area."

The contracts with Crest Oil Company and J. Fred Schlafly differed in that the favored nations clause benefits were limited to 95 percent of the price paid to other sellers.

therefore, the price per thousand cubic feet was only 22 cents (*i. e.,* ⅛th of $1.76).

## A.

The Arizona Supreme Court has not yet decided whether fugacious matter is capable of being owned before it is reduced to possession. Kerr-McGee argues that since it was the first party to reduce the gas to possession, it could not theretofore have been sold by Arizona, as the lessor, to Kerr-McGee, as the operator. Plaintiffs respond by contending that the Organic Law of Arizona required the State to take its ⅛th royalty in kind; that the transaction should, therefore, be viewed as if it did so and thereafter sold the ⅛th of the production to Kerr-McGee. We find it unnecessary to speculate on how the somewhat metaphysical questions which have been argued would be decided by the Arizona courts because we think that it is perfectly clear that the price adjustment clause in Kerr-McGee's contracts with the plaintiffs should be construed to apply to an increase in the amount paid by Kerr-McGee to the State. This conclusion is based on the following considerations:

1. The negotiation of the 64 cent market value with the State was promptly followed by a price adjustment to each of the plaintiffs. Since their contracts were then for only a one year term, *if Kerr-McGee did not consider the price adjustment clause applicable,* it is difficult to understand why it did not wait until the end of the year to increase the price to 64 cents. Plaintiffs could reasonably assume that the same price adjustment clause in subsequent contracts would be operative if the royalty payments to the State should increase again.

2. The Division Orders which Kerr-McGee prepared for execution by the State use the terms "purchase" and "pay for" in a non-technical, yet unambiguous, sense. Regardless of whether or not these terms were used with strict legal accuracy, they clearly refer to the same kind of transaction as did the price adjustment clause in the Kerr-McGee contracts with plaintiffs.[5]

3. The basic purpose of the price adjustment clause was to protect plaintiffs from discrimination. Kerr-McGee was the dominant party in the market. Its own production, derived largely from leases with the State, affected about 90% of the production in the area covered by the price adjustment clause. It is unrealistic to assume that the parties intended to eliminate the bulk of the market from the operation of the clause. Indeed, if the unchallenged findings of the district court are correct, as we must assume, the plaintiffs' share of approximately 10%, plus Kerr-McGee's full production of about 90%, would make the clause virtually useless if not applicable to Kerr-McGee's payments to Arizona.

4. The judicial determination of market value in the Arizona litigation was necessary because Kerr-McGee, as an operator under Arizona leases, was not selling gas to a third party refiner under free market conditions or as the result of arm's length bargaining. Only on the assumption that an independent refiner would pay a price of $1.76 per Mcf could that amount be considered the

5. Similarly, the following language appears in PX5, which is an amendment to the January 31, 1962 contract between Kerr-McGee and plaintiff Eastern, increasing the price of gas from 56.7 to 64 cents per Mcf:

"WHEREAS, the Arizona State Land Commissioner, for and on behalf of the State of Arizona, has executed Helium-Bearing Gas Division Order of Kerr-McGee Oil Industries, Inc. which provides for the payment, to the State of Arizona, of royalties on helium-bearing gas accrued and accruing to its interest in the above described Units and in certain other Units in the Coconino Sand Gas Pool in the Pinta Dome Area of Apache County, Arizona, *calculated at a market value or price in excess of that set forth in the aforesaid Helium-Bearing Gas Contract dated January 31, 1962.* * * *" (Emphasis added.)

"market value" for purposes of computing the State's royalty. In essence, the judgment in that litigation was a determination that a different operator would have obtained a price of $1.76 from Kerr-McGee as an independent refiner. Stated differently, $1.76 was an assumed price which Kerr-McGee, as a refiner, was paying Kerr-McGee, as an operator. Only on that assumption, made necessary because Kerr-McGee was on both sides of the bargaining table, could the royalty for the State be based on $1.76 per Mcf.

5. In their briefs, the parties have demonstrated that there can be no certainty as to whether or not the Arizona Supreme Court would find that the State technically made any "sale" of gas to Kerr-McGee. It seems unlikely that the draftsmen of the price adjustment clause intended to make the operation of that clause dependent on the answer to an obscure and unresolved technical question of Arizona law. Kerr-McGee's construction of the clause does not fit the business context in which it was negotiated.

### B.

■ The argument that Kerr-McGee's royalty payments to the State should be regarded as applicable to 100% of the gas, thereby making the effective price per thousand cubic feet only 22 cents, needs only brief mention.

Before the 64 cent rate was negotiated —indeed, probably before any helium-bearing gas had been discovered in Arizona—the State had already parted with a ⅞th interest in either the gas itself or the right to recover and market it. The risks assumed by the operator in connection with exploration, promotion, drilling and production, as well as the undertaking to pay a royalty of ⅛th of the value of the production, were significant

aspects of the consideration which the lessor accepted from the operator for reducing its interest in any future recovery to ⅛th. In the normal situation in which an operator would sell to an independent refiner, ⅛th of the aggregate price would be payable to the lessor and attributed to ⅛th of the quantity of gas sold. In this case, as determined by the Arizona court, the market value of the gas which Kerr-McGee, as operator, in effect sold to itself, as refiner, was $1.76 per Mcf.[6] The royalty payments to the State, as lessor, were computed on the basis of its ⅛th interest in a total package having a market value of $1.76 per Mcf, not on any assumption that it had a 100% interest in the package which it was selling for only ⅛th of its market value.

Kerr-McGee's argument—first advanced on this appeal—that it in effect made a purchase of 100% of the gas when it was recovered at a price of 22 cents per Mcf (or $1.76 per 8,000 cubic feet) is without substance.

### III.

The district court received certain Kerr-McGee documents which tend to prove that the company's executives interpreted the price adjustment clause as we do. Kerr-McGee argues that the exhibits were inadmissible. If so, the error was harmless since we attach no weight to them.

### IV.

■ We think Kerr-McGee correctly objects to the allowance of interest from December 8, 1966. The Arizona litigation did not finally terminate on that date, and the State received no payment at the $1.76 rate until after the litigation was concluded.

After the entry of the trial court judgment on December 8, 1966, the

---

6. The judgment of the Superior Court of Maricopa County unequivocally relates the price of $1.76, as well as other prices in the schedule set forth in its order, to a thousand cubic feet of gas. Kerr-McGee's argument that the amount should be spread over the entire production would require an interpretation of the $1.76 as a rate to be paid for each *8,000 cubic feet of gas*. The language of the order itself, as well as the actual business situation, forecloses this contention.

State appealed to the Arizona Supreme Court and ultimately a revised judgment was entered on November 15, 1968. Although the revised judgment did not change the $1.76 figure used as a reference point for comparison with the 56.7 and 64 cent prices negotiated respectively with the plaintiffs and Arizona in 1962, it did change a number of other figures in the price schedules relating to variations in the helium content of the raw gas or the sale price of the refined gas. After that judgment was entered, Kerr-McGee made payment to the State in accordance with the new schedule; the payments were retroactive to the date of first production, but included no interest or other compensation for the delay prior to November 15, 1968. In calculating the extent of Kerr-McGee's obligation to the State, no significance was attached to the date December 8, 1966, when the trial court judgment had originally been entered.

As we construe the "never be less" language in plaintiff's contracts, they were entitled to receive payment at the higher rate at the same time the State did—in other words, on November 15, 1968. Since payment was withheld pending the outcome of this litigation, they should be compensated for the use of their money from the date they were first entitled to receive it. In short, we measure the scope of Kerr-McGee's obligation to the plaintiffs precisely as the Arizona courts' final judgment measured Kerr-McGee's obligation to the State. Since the courts of Arizona did not allow interest for the period between December 8, 1966 and November 15, 1968 while the State's appeal was pending, neither do we. We believe interest should not have been accrued prior to November 15, 1968.

Except for modification in the date from which interest shall accrue, the judgment is affirmed.

PELL, Circuit Judge (dissenting in part).

The first judicial determination of the $1.76 figure was on December 8, 1966. While there was a revised judgment following appeal, the figure of $1.76 remained unchanged. This is true notwithstanding changes in other figures in the price schedule which I deem not significant on the ultimate $1.76 figure.

In the federal courts, the general rule has long been recognized that while appeal with proper supersedeas stays execution of a judgment, it does not—until and unless reversed—detract from its decisiveness and finality. Huron Holding Corp. v. Lincoln Mine Operating Co., 312 U.S. 183, 189, 61 S.Ct. 513, 85 L.Ed. 725 (1941).

An appeal does not affect the finality of a judgment, it merely stays execution thereof pending appeal, and judgment of affirmance adds nothing to the finality of the original judgment. Miller v. United States, 2 Cir., 147 F.2d 372, 374 (1945).

It is true that the first payment to the State of Arizona was not made until the entry of the revised judgment of November 15, 1968. However, the payments were retroactive to the date of first production. I understand from the record that the retroactive payments covered a period going back to a date prior to 1966. This being so, and for federal purposes the $1.76 figure having been established as a final figure as of the initial judgment on December 8, 1966, I would not disturb the judgment of the district court on the matter of interest. It appears to me, as it apparently appeared to the district court, that the 1966 date was a reasonable one under all the circumstances from which interest should be computed. I would not deem it of great significance or binding effect on this court that reasons may have existed in the state litigation which resulted in no interest being allowed there on the retroactive payments.

I would therefore respectfully dissent from that portion of the majority opinion dealing with the matter of interest and would have affirmed the judgment of the district court in its entirety.

Otherwise I concur in Judge Stevens' opinion.