ARKANSAS LOUISIANA GAS CO. *v.* HALL ᴇᴛ ᴀʟ.

No. 78–1789.   Argued April 20, 1981—Decided July 2, 1981

572

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, and BLACKMUN, JJ., joined. POWELL, J., filed a dissenting opinion, *post*, p. 585. STEVENS, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 586. STEWART, J., took no part in the consideration or decision of the case.

*Reuben Goldberg* argued the cause for petitioner. With him on the briefs were *Robert Roberts, Jr., Marlin Risinger, Jr., W. Michael Adams,* and *Glenn W. Letham.*

*James Fleet Howell* argued the cause and filed a brief for respondents.*

JUSTICE MARSHALL delivered the opinion of the Court.

The "filed rate doctrine" prohibits a federally regulated seller of natural gas from charging rates higher than those filed with the Federal Energy Regulatory Commission pursuant to the Natural Gas Act, 52 Stat. 821, as amended, 15 U. S. C. § 717 *et seq.* (1976 ed. and Supp. III). The question before us is whether that doctrine forbids a state court to calculate damages in a breach-of-contract action based on an assumption that had a higher rate been filed, the Commission would have approved it.

I

Respondents are producers of natural gas, and petitioner Arkansas Louisiana Gas Co. (Arkla) is a customer who buys their gas. In 1952, respondents[1] and Arkla entered into a contract under which respondents agreed to sell Arkla natural gas from the Sligo Gas Field in Louisiana. The contract contained a fixed price schedule and a "favored nations clause." The favored nations clause provided that if Arkla purchased Sligo Field natural gas from another party at a rate higher than the one it was paying respondents, then respondents would be entitled to a higher price for their sales to Arkla.[2]

---

*Briefs of *amici curiae* urging reversal were filed by *Solicitor General McCree, Elliott Schulder, Jerome Nelson, Jerome M. Feit,* and *Joshua Z. Rokach* for the United States et al.; and by *Edward Kliewer, Jr., Dean W. Wallace,* and *Patrick J. McCarthy* for Northern Natural Gas Co.

*James R. Coffee* and *Edward J. Kremer* filed a brief for Atlantic Richfield Co. as *amicus curiae* urging affirmance.

[1] Respondents include both original parties to the contract and successors in interest to parties to the contract.

[2] The favored nations clause provided in relevant part:

"If at any time during the term of this agreement Buyer should purchase from another party seller gas produced from the subject wells or any other well or wells located in the Sligo Gas Field at a higher price than

In 1954, respondents filed with the Federal Power Commission (now the Federal Energy Regulatory Commission)[3] the contract and their rates and obtained from the Commission a certificate authorizing the sale of gas at the rates specified in the contract.

In September 1961, Arkla purchased certain leases in the Sligo Field from the United States and began producing gas on its leasehold. In 1974, respondents filed this state-court action contending that Arkla's lease payments to the United States had triggered the favored nations clause. Because Arkla had not increased its payments to respondents as required by the clause, respondents sought as damages an amount equal to the difference between the price they actually were paid in the intervening years and the price they would have been paid had the favored nations clause gone into effect.

In its answer, Arkla denied that its lease payments were purchases of gas within the meaning of the favored nations clause. Arkla subsequently amended its answer to allege in addition that the Commission had primary jurisdiction over the issues in contention. Arkla also sought a Commission ruling that its lease payments had not triggered the favored nations clause. The Commission did not act immediately, and the case proceeded to trial. The state trial court found that Arkla's payments had triggered the favored nations clause, but nonetheless held that the filed rate doctrine pre-

is provided to be paid for gas delivered under this agreement, then in such event the price to be paid for gas thereafter delivered hereunder shall be increased by an amount equal to the difference between the price provisions hereof and the concurrently effective higher price provisions of such subsequent contract." App. 99.

[3] On October 1, 1977, the relevant responsibilities of the Federal Power Commission were transferred to the Federal Energy Regulatory Commission. See 10 CFR § 1000.1 (d) (1980). The term "Commission" in this opinion refers to the Federal Power Commission when referring to action taken prior to that date and to the Federal Energy Regulatory Commission when referring to action taken after that date.

cluded an award of damages for the period prior to 1972. The intermediate appellate court affirmed, 359 So. 2d 255 (1978), and both parties sought leave to appeal. The Supreme Court of Louisiana denied Arkla's petition for appeal, 362 So. 2d 1120 (1978), and Arkla sought certiorari in this Court on the question whether the interpretation of the favored nations clause should have been referred to the Commission. We denied the petition. 444 U. S. 878 (1979).

While Arkla's petition for certiorari was pending, the Supreme Court of Louisiana granted respondents' petition for review and reversed the intermediate court on the measure of damages. 368 So. 2d 984 (1979). The court held that respondents were entitled to damages for the period between 1961 and 1972 notwithstanding the filed rate doctrine. The court reasoned that Arkla's failure to inform respondents of the lease payments to the United States had prevented respondents from filing rate increases with the Commission, and that had respondents filed rate increases with the Commission, the rate increases would have been approved. *Id.*, at 991. After the decision by the Supreme Court of Louisiana, the Commission in May 1979 finally declined to exercise primary jurisdiction over the case, holding that the interpretation of the favored nations clause raised no matters on which the Commission had particular expertise. *Arkansas Louisiana Gas Co. v. Hall*, 7 FERC ¶ 61,175, p. 61,321.[4] The Commis-

---

[4] The May 1979 order was actually the Commission's second decision on primary jurisdiction. The Commission initially declined to exercise primary jurisdiction in March 1976, citing a then-existing policy against assuming jurisdiction over matters pending before a court. *Arkansas Louisiana Gas Co. v. Hall*, 55 F. P. C. 1018, 1020–1021. On rehearing, the Commission further noted that on October 19, 1972, respondents had gained "small producer" status, see n. 5, *infra*, and were therefore no longer required to make rate increase filings. *Arkansas Louisiana Gas Co. v. Hall*, 56 F. P. C. 2905 (1976). Arkla challenged the Commission's automatic deferral policy before the United States Court of Appeals for the District of Columbia Circuit. While the matter was pending before that court, the Commission asked that the record be remanded to it for further considera-

sion did, however, state: "It is our opinion that the Louisiana Supreme Court's award of damages for the 1961–1972 period violates the filed rate doctrine." *Id.*, at 61,325, n. 18.[5] Under that doctrine, no regulated seller is legally entitled to collect a rate in excess of the one filed with the Commission for a particular period. See *infra*, at 576–579. We granted Arkla's subsequent petition for certiorari challenging the judgment of the Louisiana Supreme Court. 449 U. S. 1109 (1981).[6]

II

Sections 4 (c) and 4 (d) of the Natural Gas Act, 52 Stat. 822–823, 15 U. S. C. §§ 717c (c) and 717c (d), require sellers of

---

tion, and the Court of Appeals granted the motion. The May 1979 order resulted from this remand, and review of that order is pending before the Court of Appeals.

[5] The Commission limited its disagreement with the state court to the period before 1972 because of its additional finding that as of October 1972 respondents had become "small producers" and were no longer required to file their rates with the Commission. See 18 CFR § 157.40 (1980). It therefore took the position that the filed rate doctrine did not apply to respondents after that date. Arkla disputes here the administrative determination that respondents met the criteria to be considered "small producers." The Commission's finding itself is not before us, and we do not believe that the state courts erred in deferring to that finding.

[6] Subsequent to the award of damages but prior to our action on Arkla's petition for certiorari, the Commission informed respondents that in order to collect a damages award amounting to a retroactive rate increase, they would have to ask the Commission to waive the filing requirements of the Natural Gas Act. Respondents sought a waiver, which was denied by the Commission. *Arkansas Louisiana Gas Co.* v. *Hall,* 13 FERC ¶ 61,000 (1980). In its order, the Commission explained that in order to grant a waiver, it would have to "speculat[e] as to what the Commission would or would not have done in 1961 . . . ." *Id.*, at 61,213. The Commission added that because the request for an increase called for contract interpretation, the 1961 Commission "would almost certainly have either suspended or rejected the filing." *Ibid.* The Commission added that granting a waiver in this case would present a "potential for disruption of natural gas markets." *Ibid.* Review of that order is pending before the United States Court of Appeals for the Fifth Circuit.

natural gas in interstate commerce to file their rates with the Commission. Under § 4 (a) of the Act, 52 Stat. 822, 15 U. S. C. § 717c (a), the rates that a regulated gas company files with the Commission for sale and transportation of natural gas are lawful only if they are "just and reasonable." No court may substitute its own judgment on reasonableness for the judgment of the Commission. The authority to decide whether the rates are reasonable is vested by § 4 of the Act solely in the Commission, see *FPC* v. *Hope Natural Gas Co.,* 320 U. S. 591, 611 (1944), and "the right to a reasonable rate is the right to the rate which the Commission files or fixes," *Montana-Dakota Utilities Co.* v. *Northwestern Public Service Co.,* 341 U. S. 246, 251 (1951).[7] Except when the Commission permits a waiver, no regulated seller of natural gas may collect a rate other than the one filed with the Commission. § 4 (d), 52 Stat. 823, 15 U. S. C. § 717c (d). These straightforward principles underlie the "filed rate doctrine," which forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority. See, *e. g., T. I. M. E. Inc.* v. *United States,* 359 U. S. 464, 473 (1959). The filed rate doctrine has its origins in this Court's cases interpreting the Interstate Commerce Act, see, *e. g., Lowden* v. *Simonds-Shields-Lonsdale Grain Co.,* 306 U. S. 516, 520–521 (1939); *Pennsylvania R. Co.* v. *International Coal Co.,* 230 U. S. 184, 196–197 (1913), and has been extended across the spectrum of regulated utilities. "The considerations underlying the doctrine . . . are preservation of the agency's primary juris-

---

[7] *Montana-Dakota Utilities* was a case under the Federal Power Act rather than under the Natural Gas Act, but as we have previously said, the relevant provisions of the two statutes "are in all material respects substantially identical." *FPC* v. *Sierra Pacific Power Co.,* 350 U. S. 348, 353 (1956). In this opinion we therefore follow our established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes. See, *e. g., ibid.; Permian Basin Area Rate Cases,* 390 U. S. 747, 820–821 (1968).

diction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant." *City of Cleveland* v. *FPC,* 174 U. S. App. D. C. 1, 10, 525 F. 2d 845, 854 (1976). See *City of Piqua* v. *FERC,* 198 U. S. App. D. C. 8, 13, 610 F. 2d 950, 955 (1979).

Not only do the courts lack authority to impose a different rate than the one approved by the Commission, but the Commission itself has no power to alter a rate retroactively.[8] When the Commission finds a rate unreasonable, it "shall determine the just and reasonable rate . . . to be *thereafter* observed and in force." § 5 (a), 52 Stat. 823, 15 U. S. C. § 717d (a) (emphasis added). See, *e. g., FPC* v. *Tennessee Gas Co.,* 371 U. S. 145, 152–153 (1962); *FPC* v. *Sierra Pacific Power Co.,* 350 U. S. 348, 353 (1956). This rule bars "the Commission's retroactive substitution of an unreasonably high or low rate with a just and reasonable rate." *City of Piqua* v. *FERC, supra,* at 12, 610 F. 2d, at 954.

In sum, the Act bars a regulated seller of natural gas from collecting a rate other than the one filed with the Commission and prevents the Commission itself from imposing a rate increase for gas already sold. Petitioner Arkla and the Commission as *amicus curiae* both argue that these rules taken in tandem are sufficient to dispose of this case. No matter how the ruling of the Louisiana Supreme Court may be characterized, they argue, it amounts to nothing less than the award of a retroactive rate increase based on speculation

---

[8] Although the Commission may not *impose* a retroactive rate alteration and, in particular, may not order reparations, see, *e. g., FPC* v. *Sunray DX Oil Co.,* 391 U. S. 9, 24 (1968), it may "for good cause shown," 15 U. S. C. § 717c (d), waive the usual requirement of timely filing of an alteration in a rate. Assuming, *arguendo,* that waiver is available for retroactive collection of a higher rate than the one on file, we note that in this case, the Commission has expressly found that respondents have not demonstrated that good cause exists for waiving the filing requirements on their behalf. See n. 6, *supra.*

about what the Commission might have done had it been faced with the facts of this case. This, they contend, is precisely what the filed rate doctrine forbids. We agree. It would undermine the congressional scheme of uniform rate regulation to allow a state court to award as damages a rate never filed with the Commission and thus never found to be reasonable within the meaning of the Act. Following that course would permit state courts to grant regulated sellers greater relief than they could obtain from the Commission itself.

In asserting that the filed rate doctrine has no application here, respondents contend first that the state court has done no more than determine the damages they have suffered as a result of Arkla's breach of the contract.[9] No federal interests, they maintain, are affected by the state court's action. But the Commission itself has found that permitting this damages award could have an "unsettling effect . . . on other gas purchase transactions" and would have a "potential for disruption of natural gas markets . . . ." *Arkansas Louisiana Gas Co.* v. *Hall*, 13 FERC ¶ 61,100, p. 61,213 (1980).[10]

---

[9] Arkla seeks to have this Court determine, as a matter of law, whether it actually breached its contract with respondents. This we decline to do. We see no reason to disagree with the Commission's judgment that interpretation of the favored nations clause raises only questions of state law. The state court found that the contract had been breached. We will not overturn the construction of Louisiana law by the highest court of that State.

[10] Apparently in an effort to challenge this determination, respondents assert that the damages would be paid entirely from Arkla's corporate assets and would not be passed on to consumers. We see no reason why this fact, even if true, would alter our analysis. In any case, the record does not support respondents' assertion that Arkla could not pass the damages award along to its customers. In its order denying respondents' request for a waiver of the § 4 (d) notice requirement, the Commission conceded that Arkla would have the right to do so, even though all the natural gas for which Arkla would be paying was long since sold. 13 FERC, at 61,213.

Even were the Commission not on record in this case, the mere fact that respondents brought this suit under state law would not rescue it, for when Congress has established an exclusive form of regulation, "there can be no divided authority over interstate commerce." *Missouri Pacific R. Co.* v. *Stroud,* 267 U. S. 404, 408 (1925). Congress here has granted exclusive authority over rate regulation to the Commission. In so doing, Congress withheld the authority to grant retroactive rate increases or to permit collection of a rate other than the one on file. It would surely be inconsistent with this congressional purpose to permit a state court to do through a breach-of-contract action what the Commission itself may not do.

We rejected an analogous claim earlier this Term in *Chicago & North Western Transp. Co.* v. *Kalo Brick & Tile Co.,* 450 U. S. 311 (1981). There, a shipper of goods by rail sought to assert a state common-law tort action for damages stemming from a regulated rail carrier's decision to cease service on a rail line. We held unanimously that because the Interstate Commerce Commission had, in approving the cessation, ruled on all issues that the shipper sought to raise in the state-court suit, the common-law action was pre-empted. In reaching our conclusion, we explained that "[a] system under which each State could, through its courts, impose on railroad carriers its own version of reasonable service requirements could hardly be more at odds with the uniformity contemplated by Congress in enacting the Interstate Commerce Act." *Id.,* at 326. To hold otherwise, we said, would merely approve "an attempt by a disappointed shipper to gain from the Iowa courts the relief it was denied by the Commission." *Id.,* at 324.

In the case before us, the Louisiana Supreme Court's award of damages to respondents was necessarily supported by an assumption that the higher rate respondents might have filed with the Commission was reasonable. Otherwise, there would have been no basis for that court's conclusion, 368

So. 2d, at 991, that the Commission would have approved the rate. But under the filed rate doctrine, the Commission alone is empowered to make that judgment, and until it has done so, no rate other than the one on file may be charged. And far from approving the rate here in issue, the Commission has expressly declined to speculate on what its predecessor might have done.[11] The court below, like the state

---

[11] Respondents assert, and the Supreme Court of Louisiana found, that the Commission has expressly approved the damages award through its repeated statements that the award is not in excess of applicable ceilings. This is simply not the case. The court below based its conclusion on the Commission's order denying rehearing on Arkla's request that it exercise primary jurisdiction. 368 So. 2d, at 991, citing *Arkansas Louisiana Gas Co.* v. *Hall*, 56 F. P. C. 2905 (1976). Nothing in that order approves the retroactive rate increase; it only lists, at the request of the parties, "the maximum rates . . . which, if contractually authorized and if proper filing procedures had been followed, would have been approved . . . ." *Id.*, at 2906. The fact that the retroactive rate increase was within the rate ceiling does not mean that it would have been approved if actually submitted, and certainly does not mean that it would be approved after the fact. In rejecting respondents' request for a waiver of its filing requirements, the Commission set forth several reasons for disapproving a rate increase falling within the ceiling rates and expressly declined to speculate on what the earlier Commission might have done. See n. 6, *supra*.

In addition to the order denying rehearing, respondents also rely on language in the Commission's May 18, 1979, order declining to exercise primary jurisdiction and in a letter from the Commission's staff counsel. Staff counsel's letter is ambiguous at best, and in any case, it should be unnecessary to add that staff counsel may not speak for the Commission. The language relied on in the May 18 order appears to have reference only to damages for the period after 1972. The same order twice disapproves granting damages for the period prior to respondents' assumption of small-producer status. See *Arkansas Louisiana Gas Co.* v. *Hall*, 7 FERC ¶ 61,175, p. 61,325, n. 18 (1979) ("It is our opinion that the Louisiana Supreme Court's award of damages for the 1961–1972 period violates the filed rate doctrine"); *id.*, at 61,325, n. 20 ("As we stated above, the Louisiana Supreme Court, in effect, waived one of this Commission's filing requirements when it determined that [respondents'] group was entitled to damages back to 1961. This holding of the Louisiana Supreme Court conflicts with the filed rate doctrine"). The unconnected and am-

court in *Kalo Brick,* has consequently usurped a function that Congress has assigned to a federal regulatory body. This the Supremacy Clause will not permit.

Respondents' theory of the case would give inordinate importance to the role of contracts between buyers and sellers in the federal scheme for regulating the sale of natural gas. Of course, as we have held on more than one occasion, nothing in the Act *forbids* parties to set their rates by contract. *E. g., Permian Basin Area Rate Cases,* 390 U. S. 747, 820–822 (1968); *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.,* 350 U. S. 332, 338–340 (1956). But those cases stand only for the proposition that the Commission itself lacks affirmative authority, absent extraordinary circumstances, to "abrogate existing contractual arrangements." *Permian Basin Area Rate Cases, supra,* at 820. See *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp., supra,* at 338–339. That rule does not affect the supremacy of the Act itself, and under the filed rate doctrine, when there is a conflict between the filed rate and the contract rate, the filed rate controls. See, *e. g., Louisville & Nashville R. Co.* v. *Maxwell,* 237 U. S. 94, 97 (1915); *Texas & Pacific R. Co.* v. *Mugg,* 202 U. S. 242, 245 (1906). "This rule is undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress . . . ." *Louisville & Nashville R. Co.* v. *Maxwell, supra,* at 97. Moreover, to permit parties to vary by private agreement the rates filed with the Commission would undercut the clear purpose of the congressional scheme: granting the Commission an opportunity in every case to judge the reasonableness of the rate. Cf. *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp., supra,* at 338–339.[12]

---

biguous references on which respondents and the court below rely to find Commission "approval" of the retroactive rate increase cannot override these express statements of disapproval.

[12] None of the other cases relied on by respondents commands a contrary result. *Skelly Oil Co.* v. *Phillips Petroleum Co.,* 339 U. S. 667 (1950), held only that federal courts are not granted jurisdiction over

Respondents also appeal to what they say are equitable considerations. The filed rate doctrine and the Supremacy Clause, we are told, should not bar recovery when the defendant's misconduct prevented filing of a higher rate. We do not find this argument compelling. The court below did not find that Arkla intentionally failed to inform respondents of its lease payments to the United States in an effort to defraud them. Consequently, we are not faced with affirmative misconduct, and we need not consider the application of the filed rate doctrine in such a case.[13] The courts

state-law declaratory judgment actions merely because a federal question might potentially be raised in defense of the suit. The only issue in *Skelly Oil* was whether certain contracts had properly been terminated, so there was no occasion to consider whether the filed rate doctrine barred a damages remedy. *United Gas Pipe Line Co.* v. *Memphis Light, Gas and Water Division,* 358 U. S. 103 (1958), like the cases mentioned in text, held only that the Act does not automatically abrogate all private contracts. And *Pan American Petroleum Corp.* v. *Superior Court,* 366 U. S. 656 (1961), stated only that a state rather than a federal court was the proper forum in which a buyer should bring a breach-of-contract action to obtain a refund of charges in *excess* of the filed rate. Permitting that action in no way contravened the filed rate doctrine; in fact, it furthered the doctrine's purpose.

We note that a panel of the District of Columbia Circuit stated in *City of Cleveland* v. *FPC,* 174 U. S. App. D. C. 1, 10–11, 525 F. 2d 845, 854–855 (1976), that "the proposition that a filed rate variant from an agreed rate is nonetheless the legal rate wages war with basic premises of the . . . Act." That case is immediately distinguishable from the one before us because it involved a claim that the rate itself had been filed in violation of a contract. We express no opinion on the merits of that case, but to the extent that the quoted dictum would lead to a contrary result in the instant case, it is expressly disapproved.

[13] We agree with the Commission's finding that Arkla "could have reasonably assumed that the government royalty payment did not trigger the [favored nations clause]." 13 FERC, at 61,213. Because the record contains no findings of misconduct, respondents' argument that this Court has consistently recognized the doctrine of estoppel has no relevance. We save for another day the question whether the filed rate doctrine applies in the face of fraudulent conduct.

below found that Arkla has done no more than commit a simple breach of its contract. But when a court is called upon to decide whether state and federal laws are in conflict, the fact that the state law has been violated does not affect the analysis. Every pre-emption case involves a conflict between a claim of right under federal law and a claim of right under state law. A finding that federal law provides a shield for the challenged conduct will almost always leave the state-law violation unredressed. Thus in *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959), the mere fact that a group of unions violated state law through their peaceful picketing did not permit enforcement of that law when it would conflict with the federal regulatory scheme. That the state-court suit was one for damages rather than for the type of relief available from the National Labor Relations Board weighed against pre-emption, not in favor of it. "[S]ince remedies form an ingredient of any integrated scheme of regulation," Justice Frankfurter wrote for the Court, "to allow the State to grant a remedy here which has been withheld from the National Labor Relations Board only accentuates the danger of conflict." *Id.,* at 247.

The same principle applies here. Permitting the state court to award what amounts to a retroactive right to collect a rate in excess of the filed rate "only accentuates the danger of conflict." No appeal to equitable principles can justify this usurpation of federal authority.

### III

We hold that the filed rate doctrine prohibits the award of damages for Arkla's breach during the period that respondents were subject to Commission jurisdiction.[14] In all respects other than those relating to damages, the judgment of the Supreme Court of Louisiana is affirmed. With respect

---

[14] There is no bar to damages for the period after respondents gained "small producer" status. See n. 5, *supra.*

to its calculation of damages, the judgment is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

JUSTICE STEWART took no part in the consideration or decision of this case.

JUSTICE POWELL, dissenting.

I agree with much of JUSTICE STEVENS' dissenting opinion and would affirm the judgment of the Supreme Court of Louisiana. Respondents are entitled to the relief they seek based on Louisiana state contract law.

By virtue of the "most favored nations" clause in its contract with respondents, petitioner was obligated to pay respondents the higher rate it paid a comparable supplier. Petitioner did not comply with this provision, but the Court today holds that respondents nevertheless may not recover damages because they failed to file with the Commission the increased rate. It is said that the "filed rate doctrine" requires such a filing.

I would agree with the Court if it were clear that respondents were neglectful or otherwise at fault in not filing and seeking Commission approval of the higher rate. But the Louisiana courts found that petitioner was responsible for respondents' failure to file. Petitioner did not disclose that it was paying higher rates to another producer from the same field under comparable conditions. The Louisiana Court of Appeal expressly found that respondents' failure to comply with the filed rate doctrine was caused primarily by the "uncooperative and evasive" conduct of petitioner's officials. See 359 So. 2d 255, 264 (1978). Petitioner knew the facts, and the Louisiana Supreme Court held that petitioner had a state-law duty to disclose them in order not to frustrate the "most favored nations" clause. There is no showing that respond-

ents had any knowledge of their entitlement to invoke the clause until they finally obtained the facts through the Freedom of Information Act. In these circumstances, the filed rate doctrine should not preclude a state-law damages action. In holding to the contrary, the Court in effect rewards petitioner's breach of its state-law contractual duty to notify respondents that it was paying a higher rate to a comparable supplier.

JUSTICE STEVENS, with whom JUSTICE REHNQUIST joins, dissenting.

From 1961 through 1975, petitioner Arkansas Louisiana Gas Co. (Arkla) acquired natural gas from two different sources in the Sligo Gas Field in Louisiana. By the terms of a contract that was entirely consistent with the federal policies reflected in the Natural Gas Act, 52 Stat. 821, as amended, 15 U. S. C. § 717 *et seq.* (1976 ed. and Supp. III), Arkla was obligated to pay both sources of supply the same price.[1] In fact, however, unbeknown to respondents, and in violation of their contract, Arkla paid them a substantially lower price than it paid to the United States, its other source for Sligo Field gas. No one, not even Arkla, suggests that there is any legitimate justification for the discrimination.

Despite the fact that Arkla breached its contract, and despite the fact that no federal policy is threatened by allowing the Louisiana courts to redress that breach, the Court today denies respondents the benefit of their lawful bargain. Surely, if the price paid to the United States was just and reasonable, the same price paid to private sellers of gas taken from the same field at the same time and delivered to the same customer also would be just and reasonable. The statutory policy favors uniformity, not secret discrimination.

---

[1] This obligation was created by the "favored nations clause" in the natural gas sales contract between Arkla and respondents. The clause is quoted *ante,* at 573–574, n. 2.

Yet the Court, by a wondrous extension of the so-called "filed rate doctrine," concludes that the Louisiana courts may not assess damages against petitioner for breach of its contract to pay respondents the same price it paid to a comparable supplier. Because no federal rule of law deprives the State of Louisiana of the power to prevent Arkla from profiting so handsomely from its own wrong, and because I believe that enforcement of the state court's judgment is not only consistent with federal regulatory policies, but actually will further those policies, I respectfully dissent.

I

As a result of lengthy proceedings in the state courts, the relevant facts have been established. Arkla is an integrated utility company engaged in the natural gas business in six States.[2] Over the years, it has purchased large quantities of natural gas produced in the Sligo Gas Field in Bossier Parish, La.; some of that gas was acquired from respondents, and some from the United States. By law, Arkla was prohibited from paying either of these suppliers more than the area ceiling price set by the Federal Power Commission, and it did not do so.[3] By contract with the United States, Arkla was required to pay an amount established by reference "to the highest price paid for a part or for a majority of production of like quality in the same field." App. 123. By contract with respondents, Arkla was obligated to pay them a price at least as high as it paid for other gas produced from any well

---

[2] Arkla does business in Arkansas, Louisiana, Texas, Oklahoma, Kansas, and Missouri.

[3] For example, in 1968 the relevant area base rate ceiling established by the Federal Power Commission for sales of natural gas was 18.6 cents per thousand cubic feet (Mcf). See *Arkansas Louisiana Gas Co. v. Hall*, 56 F. P. C. 2905, 2906 (1976). The trial court in this case found that during 1968 Arkla paid the United States a fraction over 14 cents per Mcf. See App. 11. Under the terms of the 1952 contract with respondents, Arkla paid a fraction under 10 cents per Mcf for gas produced during 1968. See *id.*, at 98.

located in the Sligo Field.[4]  See *ante,* at 573–574, n. 2.  In fact, however, it paid respondents only about two-thirds of the price paid to the United States.

Arkla did not disclose the price differential to respondents. The Louisiana Court of Appeal found that, in response to inquiries from respondents about the arrangement with the United States, "the officials of Arkla were uncooperative and evasive."  359 So. 2d 255, 264 (1978).  That court characterized Arkla's nondisclosure and evasiveness as "not commendable," but held that because, under the law of Louisiana, a "party alleging fraud has the burden of establishing it by more than a mere preponderance of the evidence," respondents had failed to prove that Arkla was guilty of actual fraud. *Ibid.*  It is clear, however, that Arkla's failure to disclose to respondents its discriminatory payments to another supplier in the same gas field constituted a breach of contract.[5]

The Louisiana Supreme Court decided that the damages for Arkla's breach of contract should be measured by the difference between the price paid to the United States and the price paid to respondents.  For the period after 1972, when

---

[4] Although Arkla consistently has contended that its lease arrangement with the United States was not a "purchase" within the meaning of the favored nations clause in its contract with respondents, that issue has been resolved against Arkla by every court that has considered it.  See *id.,* at 16; 359 So. 2d 255, 261–262 (La. App. 1978); 368 So. 2d 984, 989, and n. 4 (La. 1979).  See also *Eastern Petroleum Co.* v. *Kerr-McGee Corp.,* 447 F. 2d 569 (CA7 1971).  The Court properly declines to reopen this question of state law.  See *ante,* at 579, n. 9.

[5] Because the Louisiana courts held that the contract required Arkla to pay to respondents the higher price that was being paid to the United States, and because such payments could not have been made without revealing the existence of the higher price, there can be no doubt about Arkla's contractual duty to disclose the differential even though the Louisiana Supreme Court had no occasion to comment on this specific obligation other than by noting the applicability of the principle "that one should not be able to take advantage of his own wrongful act."  368 So. 2d, at 990.

respondents had been formally certificated as "small producers," the court held that respondents had no obligation to file new rate schedules with the Federal Power Commission because the increased rates did not exceed the ceiling rate set by the Commission.[6] Although the court recognized that respondents could not have collected higher prices during the period between 1961 and 1972 without first filing new rate schedules with the Commission,[7] it held that damages for that period were nevertheless recoverable for two reasons. First, as a matter of Louisiana law, when a party's entitlement is subject to a condition, the condition is considered to have been fulfilled when performance is prevented by the other party.[8] In this case, the court squarely held that respondents had been effectively precluded from making the

---

[6] The court explained the significance of respondents' certification as small producers:

"A 'small producer' (as defined by the Commission's regulations) may obtain a 'small producer certificate' exempting it from the requirement of having to file a rate schedule as long as the increase in rate does not exceed the ceiling rate set by the Commission. See 18 C. F. R. § 157.40. Several of the plaintiffs obtained 'small producer certificates' in October 1972, and the certificates issued to those parties were made effective as to all plaintiffs by order of the Commission." Ibid.

[7] Throughout this opinion, the term "Commission" refers to the Federal Power Commission with respect to actions taken before October 1, 1977, and to the Federal Energy Regulatory Commission with respect to actions taken thereafter. See ante, at 574, n. 3.

[8] This state-law rule was explained, as follows:

"Article 2040, properly interpreted, means that the condition is considered fulfilled, when it is the debtor, bound under that condition, who prevents the fulfillment. George W. Garig Transfer v. Harris, [226 La. 117, 75 So. 2d 28 (1954)]; Southport Mill v. Friedrichs, [171 La. 786, 132 So. 346 (1931)]; Morrison v. Mioton, [163 La. 1065, 113 So. 456 (1927)]. This rule is but an application of the long-established principles of law that he who prevents a thing may not avail himself of the non-performance he has occasioned and that one should not be able to take advantage of his own wrongful act. See Cox v. Department of Highways, 252 La. 22, 209 So. 2d 9 (1968)." 368 So. 2d, at 990.

necessary filings by Arkla's failure to inform them of its contractual arrangement with the United States.[9]   Second, after noting that respondents made no claim that they would have been entitled to an increase in excess of the area base rate ceilings established by the Commission,[10] and after noting that an order of the Commission had indicated that it would have approved the rate increase if it had been filed,[11] the court concluded that "it was more probable than not that the Commission would have approved a contractually-authorized price increase if the proper filing procedures had been followed." 368 So. 2d 984, 991 (1979).

Summarizing the effect of the state courts' rulings, these

---

[9] "To realize this higher, contractually-authorized price, plaintiffs, pursuant to the Natural Gas Act, were required to file new rate schedules with the Commission.   However, plaintiffs were effectively precluded from making the requisite filings because they were not, at any time, informed by defendant that it was, in fact, paying a higher price to another party seller.   Although defendant was only bound to pay plaintiffs a higher price if plaintiffs filed new rate schedules with the Commission, it is apparent that defendant prevented the fulfillment of that condition (plaintiffs filing with the Commission) by failing to inform plaintiffs of its contractual arrangements with the United States government.   Pursuant to article 2040 and this court's jurisprudence interpreting that article, the condition (that plaintiffs file new rate schedules) is considered fulfilled." *Ibid.*

[10] The Louisiana Supreme Court expressly noted its understanding of respondents' position:

"We note that plaintiffs make no claim that they would have been entitled to a price increase under their contract in excess of the respective area base rate ceilings for sales of natural gas as established by order of the Commission." *Id.,* at 991, n. 7.

[11] "At trial, a November 8, 1976 order of the Commission was produced which indicated the maximum rates to which plaintiffs would have been entitled if contractually authorized and *if* proper filing procedures had been followed (Exhibit D–59).   The Commission clearly indicated in its order that it would have approved such rates.   No evidence was adduced by defendant to establish that Commission approval would have been unlikely." *Id.,* at 991 (emphasis in original).

propositions must be taken as having been established: (1) Arkla breached its contract with respondents; (2) Arkla is responsible for respondents' failure to file new rate schedules with the Commission; (3) if such schedules had been filed, and if Arkla had paid respondents the same prices it paid to the United States, those prices would not have exceeded the applicable area rate ceilings established by the Commission; and (4) because prices well below the applicable rate ceilings are at the very least presumptively "just and reasonable," it is indeed more probable than not that the Commission would have approved the new rate schedule if it had been promptly filed. These propositions are plainly adequate to support respondents' recovery of damages as a matter of state law. In my opinion, they also support the conclusion that the applicable rules of state law have not been pre-empted by federal law.

## II

Section 4 of the Natural Gas Act, 52 Stat. 822, 15 U. S. C. § 717c, identifies four separate federal policies that are arguably implicated by this litigation. The judgment of the Supreme Court of Louisiana is fully consistent with each of these policies.

First, subsection (a) of § 4 requires that all charges paid or received by regulated companies for the sale of natural gas shall be "just and reasonable." [12] In this case, there is no dispute about the fact that the prices received from Arkla by the United States were well below the relevant area ceiling rates fixed by the Federal Power Commission. It is equally clear that payment of the same prices to respondents for com-

---

[12] Section 4 (a) of the Act provides:

"All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful." 52 Stat. 822, 15 U. S. C. § 717c (a).

parable gas contemporaneously produced in the same field also would have been well below the ceiling. Both the Louisiana courts and the Commission have repeatedly and unambiguously determined that if respondents had been paid in accordance with the terms of their contract, there would have been no violation of the applicable area ceiling rates.[13] Indeed, in noting that respondents were not required to file new rates for the period after they had been certificated as small producers in 1972, the Commission expressly found "that the rates requested are within what the Commission has determined to be the zone of reasonableness." [14]

---

[13] See App. 18–19; 368 So. 2d, at 991, and n. 7; 56 F. P. C., at 2906.

[14] In an order entered on May 18, 1979, declining to exercise jurisdiction to determine whether Arkla had violated the favored nations clause in its contract with respondents, the Federal Energy Regulatory Commission stated:

"Finally, we must decide now what impact this case has on our regulatory responsibilities. This type of case, involving small producers not required by regulation under the Natural Gas Act to file for rate increases authorized by contract, is not a matter of great import to our regulatory responsibility as we find no need for a uniform interpretation of a contractual provision, and find that the rates requested are within what the Commission has determined to be the zone of reasonableness.

"On the facts of this case, the damages do not exceed applicable area ceiling rates. The Louisiana Supreme Court concluded that the Hall group was entitled to damages measured by the difference between the price Arkla paid the United States under the royalty agreement and the price it paid the Hall group. In so doing, it noted that it considered the fact that the Commission, in previous orders in this case, had stated the maximum rates to which the Hall group would have been entitled if contractually authorized and if proper filing procedures had been followed. The Supreme Court of Louisiana further stated:

"We note that plaintiffs make no claim that they would have been entitled to a price increase under their contract in excess of the respective area base rate ceilings for sales of natural gas as established by order of the Commission.

"In light of the fact that the Hall group makes no claim for damages higher than the applicable area ceiling rates, that the Louisiana Supreme Court did not authorize rates higher than the applicable area ceiling rates, and that the state district court on remand from the Louisiana Supreme

It is perfectly clear that an award of damages against Arkla measured by the prices it paid to the United States will not violate the Act's substantive prohibition against charging rates that are not "just and reasonable." That prohibition has the same application to respondents for the period after 1972, when they were certificated as small producers, as it does for the period prior to 1972. In neither of those periods did the Commission specifically determine that the rates were "just and reasonable," but the record makes it clear that those rates were in fact within the zone of reasonableness established by the Commission during both periods. For the purpose of determining whether damages are recoverable in a state-court breach-of-contract suit, there is no reason to treat the two periods differently. There is simply nothing in this record to suggest that a state-court judgment that has the effect of allowing respondents to receive the same prices that Arkla paid to the United States would violate the *substantive* policy underlying the statutory requirement that all rates be just and reasonable.[15]

---

Court will presumably not award damages higher than the area ceiling rates, we do not feel that our regulatory responsibilities are so affected that we must exercise our jurisdiction in this case." *Arkansas Louisiana Gas Co.* v. *Hall*, 7 FERC ¶ 61,175, pp. 61,323–61,324 (1979) (footnotes omitted).

[15] Arkla has argued that the award of damages improperly included an amount attributable to the liquefiable hydrocarbons in the natural gas produced from respondents' wells. If that argument were valid, it would simply establish an error in the computation of the amount required to be paid to respondents under their contract, and would require adjustment of the post-1972, as well as the pre-1972, award. No tribunal has found any greater merit in this argument than in Arkla's continuing claims that it did not breach its contract because its lease arrangement with the United States did not trigger the favored nations clause, and that respondents are not really small producers. At any rate, Arkla has challenged the Louisiana courts' computation of damages in a separate petition for certiorari, No. 79–1896, *Arkansas Louisiana Gas Co.* v. *Hall* (vacated and remanded, *post,* p. 917), and the question thus is not properly presented here.

Second, subsection (b) of § 4 expresses the strong federal policy—reflected in most regulatory statutes—against discriminatory pricing.[16] The result the Court reaches today not only tolerates a blatant violation of that policy, but also will encourage such violations in the future.

Entirely apart from Arkla's contractual undertaking to pay respondents the same price it paid to other producers of comparable gas in the same field, this statutory policy surely favors a holding that results in equal treatment of competing suppliers. Nothing other than Arkla's proven wrongdoing provides any explanation for its discrimination against respondents. For no one has pointed to any even arguably legitimate justification for any differential pricing at all—let alone a differential of the magnitude revealed by this record. The lesson this case will teach is that, notwithstanding the plain language in § 4 (b), it is perfectly proper to grant an undue preference if one can conceal it.

Third, subsection (c) of § 4 expresses a policy favoring the public disclosure of all rates and charges and all contracts which affect rates.[17] The contractual arrangement between

---

[16] Section 4 (b) provides:

"No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service." 52 Stat. 822, 15 U. S. C. § 717c (b).

[17] Section 4 (c) provides:

"Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time . . . and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services." 52 Stat. 822, 15 U. S. C. § 717c (c).

Arkla and the United States relating to production in the Sligo Gas Field was not made available to the public. Only by resort to the remedies provided by the Freedom of Information Act were respondents able to obtain access to that contract and to confirm their suspicions that Arkla was violating its "favored nations" undertaking. By rewarding Arkla's successful concealment of a contract that directly affected rates payable for gas produced in the Sligo Field, the Court simply ignores the statutory policy which the Louisiana Supreme Court's judgment would plainly serve.

Fourth, subsection (d) of § 4 imposes a procedural requirement that is designed to protect the substantive policy interests reflected in the three preceding subsections.[18] Because none of these substantive policies is infringed in the slightest by the state court's judgment, it surely exalts procedure over substance to deny respondents relief because they were wrongfully prevented from following the normal statutory procedures.

Under the normal procedures, no change in rates may take effect until after 30 days' notice is given to the Commission and to the public by filing a new schedule with the Commission. This filing requirement is designed to give the Commission the opportunity to prevent new rates from going into effect if it has reason to believe the new rates are not just and

---

[18] Section 4 (d) provides:

"Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published." 52 Stat. 823, 15 U. S. C. § 717c (d).

reasonable. In this case, if the record provided any basis for believing that the rates that Arkla paid to the United States were not just and reasonable—or that paying the same rates to these respondents would not have been equally just and reasonable—it might make some sense to argue that the filing requirement of § 4 (d) precludes recovery of damages for breach of contract. But to regard the filing requirement as an inflexible barrier to any recovery regardless of the substantive merits of the claim is neither necessary to further, nor even consistent with, the purpose of § 4 (d).[19]

It is commonplace that damages must often be measured by reference to a standard or an event that did not actually materialize. When an executory contract is breached, the attempt to measure the injured party's damages requires an evaluation of the benefits that probably would have resulted if the breach had not occurred.[20] If an attorney hired by

---

[19] One of the weaknesses in the Court's consideration of this issue is its implicit assumption that the filing requirement has the same importance under all regulatory statutes. Under the Natural Gas Act, however, the source of the rate is the parties' contract which must be filed to enable the Commission to review its reasonableness; in contrast, under the Interstate Commerce Act, because private rate agreements are precluded, the source of the rate is the carrier's filed tariff. As Justice Harlan pointed out for a unanimous Court in *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.*, 350 U. S. 332, 338:

"In construing the Act, we should bear in mind that it evinces no purpose to abrogate private rate contracts as such. To the contrary, by requiring contracts to be filed with the Commission, the Act expressly recognizes that rates to particular customers may be set by individual contracts. In this respect, the Act is in marked contrast to the Interstate Commerce Act, which in effect precludes private rate agreements by its requirement that the rates to all shippers be uniform, a requirement which made unnecessary any provision for filing contracts."

[20] Every first-year law student is familiar with this rule:

"Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i. e., according to the usual course of

respondents to file a new rate schedule negligently failed to do so, he might defend against a malpractice complaint by arguing that respondents were not damaged because the Commission would have rejected the new rates in all events. But if respondents could prove that rejection was highly unlikely, it would be absurd to deny them any recovery at all simply because the defendant's own wrongdoing had made it impossible to know with absolute certainty that new rates would have been accepted as "just and reasonable." In damages actions, whether in tort or in breach of contract, it is often necessary to deal in probabilities.

This case also raises a question that requires the evaluation of probabilities. Because the rates in issue were below the applicable Commission ceilings, and because no legitimate reason for rejecting them has been adduced, it is only reasonable to presume that they would have become effective routinely. As a garden-variety issue of damages, there is no significant difference between this case and one in which a purchaser might have employed thugs to waylay the respondents' lawyer on the way to the Commission to prevent him from filing a new schedule.

Nor in terms of federal regulatory policy is there any difference between this case and hypothetical cases involving actual fraud or violence.[21] If damages cannot be measured

---

things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it." *Hadley* v. *Baxendale*, 9 Ex. 341, 354, 156 Eng. Rep. 145, 151 (1854).

[21] The Court seems to attach great significance to the fact that respondents failed to prove that Arkla was guilty of actual fraud, see *ante*, at 583–584, and n. 13, but suggests no reason why the case might be decided differently if actual fraud had been proved by clear and convincing evidence. Surely a state court should not be able to avoid federal preemption of state remedies by applying a different label to conduct with precisely the same economic consequences. Cf. *Montana-Dakota Utilities Co.* v. *Northwestern Public Service Co.*, 341 U. S. 246, 252–253.

by reference to any standard except a rate that has been duly filed with the Commission in accordance with the procedural requirements of § 4 (d), there could be no state-law recovery no matter what kind of wrong prevented respondents from filing. And conversely, if a high probability that a timely filing would have been accepted is an adequate standard for measuring damages in a tort case, why should not that probability be adequate in a breach-of-contract case as well? The fact that a regulated carrier or seller has no right to collect a rate or price that has not been duly filed with the appropriate regulatory body is surely not a sufficient reason for leaping to the conclusion that an injured party may never prove damages by reference to a standard that is less certain than a filed rate.

The federal policy that comes closest to supporting Arkla's position is that of protecting the Commission's primary jurisdiction to determine whether or not a new rate is reasonable. But in this case the basic reasonableness determination was made by the Commission when it established the area rate ceilings. Because the rates at issue in this case are well below those ceilings, the danger that a court might venture into the area of ratemaking on its own is not present. Moreover, on more than one occasion Arkla requested the Commission to assume jurisdiction of this controversy, and the Commission consistently declined to do so.[22] In assessing damages for the breach of an executory contract, the state courts exercised a jurisdiction that the Commission did not have. In no sense did the Louisiana courts usurp the primary jurisdiction of the Commission. In sum, whether we test the state-court judgment against the substantive or the procedural requirements of the federal statute, it seems perfectly clear that the relief that has been awarded is fully consistent with federal policy.

---

[22] See *Arkansas Louisiana Gas Co.* v. *Hall*, 55 F. P. C. 1018 (1976); 7 FERC ¶ 61,175 (1979).

## III

Although, until today, the term "filed rate doctrine" had never been used by this Court, our prior decisions have established rather clear contours for the doctrine. It apparently encompasses two components, both of which are entirely consistent with the award of damages ordered by the Louisiana Supreme Court in this case.

First, the two cases that are generally accepted as the source of the doctrine, *Montana-Dakota Utilities Co.* v. *Northwestern Public Service Co.*, 341 U. S. 246,[23] and *T. I. M. E. Inc.* v. *United States*, 359 U. S. 464,[24] established that an

[23] In *Montana-Dakota Utilities*, the plaintiff claimed injury because the filed rates that had applied to past transactions with an affiliate allegedly were unjust and unreasonable, and had been fraudulently established. The ultimate issue was whether a federal claim for relief had been alleged, because there was no diversity of citizenship to support federal jurisdiction. The Court first held that the Federal Power Act's requirement that rates be reasonable did not provide a statutory basis for a federal cause of action because the courts have no authority to determine what a reasonable rate in the past should have been. The Court then held that the allegations of fraud added nothing to the plaintiff's federal claim. Assuming that an actionable wrong had been alleged, the Court concluded that in the absence of diversity, a federal court could only dismiss the complaint for failure to state a claim cognizable in federal court. And finally, the Court rejected the argument of Justice Frankfurter in dissent that it should fashion an implied federal judicial remedy in which the issue of reasonableness could be referred to the Commission. In refusing to create a federal remedy for a common-law fraud, the Court assumed that appropriate relief would be available in a state tribunal. Its opinion surely cannot be read as pre-empting any such state claim.

[24] In *T. I. M. E. Inc.*, the Court refused to find a federal remedy for a shipper who claimed that the rates charged by a motor carrier were unreasonable and unlawful even though they had been properly filed with the Interstate Commerce Commission. The case involved little more than a determination that the express remedies afforded against rail carriers in Part I and against water carriers in Part III of the Interstate Commerce Act, having been deliberately omitted from Part II, which regulated motor carriers, would not be judicially implied. In *T. I. M. E. Inc.*, as in *Montana-Dakota Utilities*, the question was whether a federal court

entity whose prices or rates are regulated by a federal agency has no federal right to claim any rate or price that has not been filed with and approved by the agency. Thus, these respondents, without either filing the escalated rates or obtaining a waiver of the filing requirement, have no *federal* right to require Arkla to pay the higher rates. That does not mean, however, that they have no *contractual* right to require Arkla to do so. Cf. *Pan American Petroleum Corp.* v. *Superior Court,* 366 U. S. 656, 662–664. The question whether a state court could measure damages for breach of contract, or a tort, by reference to a rate schedule that presumably would have been accepted if it had been filed earlier is by no means the same as the question whether respondents had a federal right to collect such rates. There would be a valid federal objection to such a damages award if there were reason to believe that the parties had entered into an agreement to circumvent either a procedural or a substantive requirement of the Natural Gas Act, or if the litigation arguably represented a collusive method of granting an unlawful preference. But no such considerations are present in this case.

Second, *Montana-Dakota Utilities* and *T. I. M. E. Inc.* also recognize that the task of determining in the first instance what rate should be considered "reasonable" within the meaning of a regulatory statute is not a judicial task, but rather is a task for the administrative agency. But when the zone of reasonableness has already been established by an agency—

---

had authority to decide that a filed rate was unlawful because it violated the reasonableness requirement of the relevant regulatory statute. In the present case, however, there is no claim that the price that Arkla paid to respondents was illegal in any sense. Both that price and the higher price paid to the United States were well within the zone of reasonableness and in full compliance with the statute's substantive requirements. The fact that respondents might not be able to assert a federal claim for violation of the federal statute sheds no light on the question whether their state-law cause of action for breach of contract may be maintained.

as it has been in this case—that consideration simply does not apply to an award of damages measured by reference to a standard that is well within that zone.

In my judgment, the cases which gave rise to the filed rate doctrine are plainly distinguishable from the present case, and thus do not support the result the Court reaches today. In *Montana-Dakota Utilities* and *T. I. M. E. Inc.*, the plaintiff's claim was that the filed rate, which had already been approved by the relevant federal regulatory body, was nonetheless unreasonable in violation of federal statutory requirements.[25] The plaintiff's suit thus directly challenged the rate determinations of the federal agency without compliance with the judicial review procedures established in the governing statute.[26] In the present case, in contrast, respondents do not contend that the filed rate, approved by the Commission, is unreasonable or otherwise inconsistent with federal law; they contend only that they had a contractual right to receive a different reasonable rate under their contract with Arkla. Respondents do not seek to enforce a federal right outside

---

[25] See also *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426.

[26] The concise statement of the holding in *Montana-Dakota Utilities* indicates that the Court's central concern was to bar actions which asserted a federal right to a "reasonable" rate other than that declared to be reasonable by the Commission:

"We hold that the right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one." 341 U. S., at 251–252.

Of course, in this case respondents are not invoking a federal right to receive a reasonable rate, but rather a state-law right to receive the rate for which they contracted. Similarly, the Louisiana Supreme Court's decision is not based on a determination that the rate requested by respondents is "the only or the more reasonable one," but rather on a determination that respondents are entitled to that rate under their contract with Arkla.

the procedures established for the vindication of such rights, nor do they seek to overturn the determinations of the expert federal agency; respondents merely seek to recover the higher of two rates, both of which are within the federal zone of reasonableness, because it is the rate they contracted to receive.[27] Cf. *Hewitt-Robins Inc.* v. *Eastern Freight-Ways, Inc.,* 371 U. S. 84.

The unanimous decision in *United Gas Pipe Line Co.* v. *Mobile Gas Service Co.,* 350 U. S. 332, sheds more light on this case than do the cases on which the Court places its primary reliance. In *United Gas,* United, a regulated natural gas producer, supplied gas to Mobile under a long-term contract which had been filed with and approved by the Federal Power Commission. United thereafter filed with the Commission a new rate that purported to increase the price payable by Mobile under the contract. The Commission denied Mobile's request that it reject United's filing, and held that the increased rate was the applicable rate unless and until it was declared unlawful by the Commission. *Id.,* at 336–337. This Court rejected the Commission's position, holding that compliance with the filing procedure of § 4 (d) was effective to establish a new rate only if that rate were otherwise lawful, that is, in compliance with contractual requirements. *Id.,* at 339–340. The Court found that although the new rate filed by United had been established in compliance with fed-

---

[27] This distinction not only undercuts the Court's reliance on the filed rate doctrine, but also renders wholly inapposite our decision earlier this Term in *Chicago & North Western Transp. Co.* v. *Kalo Brick & Tile Co.,* 450 U. S. 311, on which the Court relies heavily. See *ante,* at 580–582. The filed rate doctrine was not remotely implicated in that decision. Our holding in *Kalo Brick* that the Interstate Commerce Commission had decided the precise issues that the shipper sought to raise in state-court litigation is wholly dissimilar from this case in which the regulatory agency rejected the opportunity to decide the questions presented to the Louisiana courts. This is not merely an attempt by a disappointed litigant to gain from the state courts the relief it has been denied by the Commission. See *ante,* at 580.

eral law, it was unlawful under the contract. The Court accordingly held that the Commission had erred in failing to reject United's filing, and directed that United make restitution to Mobile of all overpayments. *Id.,* at 347.

Under the rationale in *United Gas,* private parties have a right to establish a lawful rate by contract as long as the rate they have agreed upon is just and reasonable. When the contract rate is within the zone of reasonableness established by the Commission, that contract rate is presumptively lawful,[28] and not subject to unilateral change.[29] The Commission has no power to specify a rate other than the contract rate when that rate is itself just and reasonable.[30] Neither the filed rate

---

[28] As the Court noted, whenever a new rate is filed, "the Commission's only concern is with the reasonableness of the *new* rate." 350 U. S., at 340 (emphasis in original).

[29] This prohibition is founded not only on the law of contracts, but also on the Act itself:

"Our conclusion that the Natural Gas Act does not empower natural gas companies unilaterally to change their contracts fully promotes the purposes of the Act. By preserving the integrity of contracts, it permits the stability of supply arrangements which all agree is essential to the health of the natural gas industry." *Id.,* at 344.

[30] While there are differences between this case and *United Gas,* it seems to me that the cases are nonetheless closely analogous. In the present case, as in *United Gas,* one party to a duly filed contract attempted unilaterally to change the price at which natural gas would be sold under the contract. In *United Gas,* United did so directly by filing an increased rate with the Commission; in this case, the unilateral change was accomplished indirectly when Arkla prevented respondents from taking the steps necessary to recover the contractually authorized higher rate. Of course, in *United Gas* the lawful contract rate had actually been approved by the Commission, while in this case the contract rate claimed by respondents has never been filed. This distinction is not, however, of controlling significance. In *United Gas,* the Court was confronted with two rates, both presumptively reasonable, of which only one was lawful under the contract. In the present case, we are confronted with essentially the same situation. While the rate ultimately awarded in *United Gas* had in fact been filed with the Commission, it was not the

doctrine, nor any other principle of federal regulatory law, requires the result the Court announces today.

## IV

In an attempt to bolster its reliance on the filed rate doctrine, Arkla contends that we cannot be sure that, if respondents had been notified of the United States lease and had filed a new rate schedule in 1961, the Commission would have approved their new rates. This argument is supported by statements in an order entered by the Commission on November 5, 1980.[31] That order was entered after the petition for certiorari had been filed, and after the United States and the Commission had taken the position as *amici* in this Court

rate currently recognized by the Commission as "just and reasonable," because it had been replaced by the new rate filed by United. The Court nonetheless directed that Mobile pay only the old rate, which the Commission's order had purported to supersede. The lawful rate in *United Gas* is analogous to the contractually authorized rate in this case because it was presumptively reasonable, having received Commission approval, but was not the currently applicable filed rate for the gas sales at issue. In light of this fact, I can see no reason why respondents should be precluded from recovering from Arkla a presumptively reasonable rate, well below applicable Commission rate ceilings, merely because Arkla's own breach of contract prevented respondents from filing that rate with the Commission.

[31] The Commission stated:

"Finally, we confess that we are at least troubled by the prospect of speculating as to what the Commission would or would not have done in 1961 had it been confronted at that time with a rate increase filing by the Hall group. . . . Whether the Commission in 1961 would have provided a forum for resolving the contractual dispute is a question we cannot answer definitively . . . . At that time, the Commission might well have concluded that the favored nations clause was not triggered. More importantly, even if the Commission in 1961 had reached the same contractional interpretation as the Louisiana court, the Commission might have determined that the public interest would not permit the grant of rate increases based upon the triggering of favored nations clauses even in existing contracts." *Arkansas Louisiana Gas Co.* v. *Hall,* ·13 FERC ¶ 61,100, p. 61,213 (1980).

that the Louisiana Supreme Court had erred in awarding damages for the period between 1961 and 1972.[32] Because the Commission had decided to lend its support to Arkla in this Court, it is not surprising that some of the statements in that order are consistent with Arkla's argument. What is most significant about that order is the fact that the Commission does not advance any reason why a rate schedule filed by respondents in 1961 in accordance with the favored nations clause of their contract with Arkla would not have been deemed just and reasonable.

Although the Commission stated that it was reluctant to speculate about what its predecessors might have done in response to such a filing, the only issues that it now can describe as speculative are issues that have been decided against Arkla. I do not believe speculation that the Commission might have committed error in 1961 is an adequate reason for not presuming that just and reasonable rates would have been routinely approved when filed.

The first issue on which the Commission indicates a reluctance to speculate is a question of contract interpretation, namely, whether the favored nations clause had been triggered by Arkla's arrangement with the United States. There is no reason for the Commission, or anyone else, to speculate on this question. The Commission twice was presented with the opportunity to decide this question, and it twice declined

---

[32] The petition was filed on May 29, 1979. On October 1, 1979, the Court requested the views of the Solicitor General. A brief was filed by the Solicitor General on behalf of the United States and the Federal Energy Regulatory Commission on February 11, 1980, in which the *amici* took the position that the Louisiana Supreme Court had erred. The *amici* maintained that the error was sufficiently serious to warrant review, but recommended that the Court defer action until the Commission had acted on respondents' request for a waiver of the § 4 (d) filing requirement. The Commission denied that request in its November 5 order, and shortly thereafter the *amici* recommended that certiorari be granted, and that the decision of the Louisiana Supreme Court be reversed.

to do so.[33]   That question now has been correctly resolved by the Louisiana courts.   The other issue on which the Commission declines to speculate is whether its predecessor would have regarded a favored nations clause in a pre-1961 contract as lawful.   Again, speculation is wholly unnecessary.   The Commission actually confronted that precise issue in 1961. Although it concluded that such escalation clauses should be prohibited in the future, it specifically decided that it would not eliminate such provisions from previously executed contracts.[34]   That the Commission's treatment of that issue in

---

[33] On September 11, 1975, Arkla filed a petition with the Federal Power Commission requesting a declaratory order holding that the "favored nations" clause in its contract with respondents had not been triggered by the royalty payments made by Arkla to the United States.   The Commission denied the petition, stating in part:

"This case presents a question of concurrent jurisdiction, not primary or exclusive jurisdiction.   The Commission has jurisdiction over rates, filing and notice as to both Arkla and Respondents.   While this Commission has jurisdiction to decide the subject contract question, the Louisiana court also has jurisdiction over an action based upon asserted breach of contract.   Accordingly, we believe it appropriate to defer to the court to decide these contract questions."   55 F. P. C., at 1020 (footnote omitted). On May 18, 1979, the Federal Energy Regulatory Commission re-examined this issue and came to the same conclusion, although for different reasons, in the order from which I have quoted in n. 14, *supra*.

[34] After explaining its reasons for prohibiting indefinite escalation clauses in newly executed contracts, the Commission stated:

"However, we are convinced that we cannot declare the escalation provisions in Pure's contracts with El Paso void or voidable, and thus in effect strike them from the contracts.   There is no question but that these exceedingly material parts of the contracts were a basic part of the exchange between the parties in arriving at these agreements.   Under familiar rules of law, if these material provisions are stricken, the contracts, which lack any provisions for the severability of parts found invalid, must also fall.   This would result in legal and regulatory problems that might cause material harm to the public, harm that might well exceed the injurious effects of the escalation provisions themselves.   For example, if these provisions were stricken and the contracts fell, the producer's sales might then presumably constitute *ex parte* offerings of gas and the pro-

1961 is applicable to the contracts between respondents and Arkla is demonstrated by the fact that the escalated rates are accepted by the Court and the Commission for the purpose of computing respondents' damages for the period between 1972 and 1975. If the favored nations clause in this pre-1961 contract were not perfectly lawful, respondents would receive no damages at all, rather than the truncated recovery which the Court's holding today allows.

The Commission also has expressed concern about the impact of this damages award on its broader "regulatory responsibilities." See *Arkansas Louisiana Gas Co.* v. *Hall,* 13 FERC ¶ 61,100, p. 61,213 (1980). Two specific concerns are identified—that the burden of the award might be passed on to consumers, and that it might give rise to other claims that favored nations clauses have been breached. The short answer to the first concern is that there is no more reason to assume that this award will justify an increase in utility rates than any other damages judgment that a public utility may be required to pay; if the regulatory concern is valid, the agency having jurisdiction over Arkla's sales has ample authority to require its stockholders rather than its customers to bear this additional cost. The second concern seems exaggerated because it applies only to contracts executed before 1961, see *supra,* at 606 and this page, and n. 34, and it seems unlikely that many large purchasers of natural gas could successfully have concealed violations of escalation clauses from their suppliers. To the extent that this case does have counterparts in such contracts, however, it seems to me

---

ducer could change its rates at will, unimpeded by any contractual limitations of the kind that presently exist. Thus, instead of being limited under the *Mobile* and related decisions only to increases permitted by contractual provisions, the company could file for increases whenever it happened to feel justified in doing so. Thus the uncertainty and spiraling prices resulting from the escalation clauses might well be compounded many times over." *The Pure Oil Co.,* 25 F. P. C. 383, 388–389 (1961).

that those cases should be decided in the same way. After all, we are concerned here merely with cases in which a utility has failed to pay an agreed price that is well below the just and reasonable ceiling set by the Commission.

I agree that speculation about what the Commissioners might have done in 1961 is inappropriate. Unlike the Court, however, I see no need to speculate in this case. Rather than speculate, I would presume that the Commission would have acted in a lawful manner and that it would then have perceived the correct answer to disputed questions that have subsequently been resolved.

In my judgment, the Court's decision today is founded on nothing more than the mechanical application to this case of principles developed in other contexts to serve other purposes. The Court commits manifest error by applying the filed rate doctrine to ratify action by Arkla that not only breached its contract with respondents, but also directly undercut the substantive policies identified in § 4 of the Natural Gas Act. Because absolutely no federal interest is served by today's intrusion into state contract law, I respectfully dissent.